UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES WILSON,	Case No. 17-10263

        Plaintiff,	SENIOR U.S. DISTRICT JUDGE
v.	ARTHUR J. TARNOW

RELIANCE STANDARD LIFE INSURANCE	U.S. MAGISTRATE JUDGE
COMPANY,	MONA K. MAJZOUB

        Defendant.
_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [10]; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11]**

Plaintiff James Wilson is a 55-year-old resident of Ann Arbor, Michigan. He suffers from a malignant cancer (lymphoma) of the spine, HIV, gastroesophageal reflux disease, and hypertension. He challenges the decision by Defendant Reliance Standard Life Insurance Company to deny his claim for Long Term Disability ("LTD") benefits issued under an ERISA-governed employee benefit plan ("the Plan") to his employer, RCF Information Systems. Plaintiff's claim falls under 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

For the reasons stated below, Defendant's Motion for Summary Judgment [10] is **GRANTED**. Plaintiff's Motion for Summary Judgment [11] is **DENIED**.

**FACTUAL BACKGROUND**

I.    **Terms of the Insurance Policy**

In 2011, Defendant issued to RCF a group LTD policy that provides coverage to active, full time RCF employees. Under that policy,

"Totally Disabled" and "Total Disability" mean, that as a result of an Injury or Sickness:

> (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her Regular Occupation;
>
>> (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her Regular Occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled except during the Elimination Period;
>>
>> (b) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and
>
> (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of Any Occupation. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

(AR10).

## II. Plaintiff's Medical and Claims History

### A. Pre-Termination

Plaintiff was in the U.S. Air Force from 1981 through 1991. From July 1, 2011 through December 13, 2014, Plaintiff worked as an IT Programmer/Systems Analyst[1] (a sedentary occupation) for RCF Information System, a defense contractor. Plaintiff was

---

[1] "A Programmer-Analyst plans, develops, tests, and documents computer programs, applying knowledge of programming techniques and computer systems." (AR1138). https://www.bls.gov/ooh/computer-and-information-technology/computer-systems-analysts.htm

living in Ohio at this time. RCF purchased group disability coverage from Defendant effective June 1, 2011. (AR001).

In November 2014, Plaintiff was briefly hospitalized at Wright Patterson Air Force Base Hospital, where he was diagnosed with malignant cancer (lymphoma) of the spine. (AR215). Plaintiff applied for Short Term Disability ("STD") benefits in December 2014. (AR211). Dr. Nicholas Conger, M.D. completed an Attending Physician's Statement in which he diagnosed Plaintiff with "inflammatory mass of the lumbar spine" and indicated that Plaintiff was unable to perform his job. (AR209). On December 28, 2014, Dr. Borislav Hristov, Chief of Radiation Oncology, recommended that Plaintiff "be off of work" while he received intensive radiation therapy. (AR215). Defendant promptly approved Plaintiff's STD benefits claim. (AR53-76).

Plaintiff received radiation therapy from December 30, 2014 through January 2, 2015. Shortly thereafter, he began chemotherapy. He received his final chemotherapy on April 20, 2015. (AR269). Shortly thereafter, Lieutenant Colonel Roger A. Wood, Chief of Hematology/Oncology, indicated that Plaintiff cares for himself, but was "[u]nable to carry on normal activity or to do active work." (AR266). Wood also stated that Plaintiff "[r]equires occasional assistance but is able to care for most personal needs." *Id.* Plaintiff also "[r]equires considerable assistance and frequent medical care." *Id.*

It appears that Defendant approved Plaintiff's claim for Long Term Disability ("LTD") benefits in May 2015. (AR124-26). Wood twice extended Plaintiff's leave until approximately August or November 2015. (AR265, 266).

Plaintiff treated with a number of doctors throughout the summer and fall of 2015. He saw Dr. Niklas Mackler, M.D. on June 16, 2015. Dr. Mackler noted that Plaintiff was "steadily improving his strength" and that there was "no clinical evidence to suggest relapse" of Burkitt's lymphoma. (AR 349-50). A few days later, Dr. Roger Chen, M.D. evaluated Plaintiff. Plaintiff told Dr. Chen that "his coughing has improved." (AR469). Plaintiff denied chest pain or wheezing and had no fever or chills. *Id.*

On July 1, 2015, Plaintiff returned to Dr. Mackler, who found that Plaintiff was "making a steady recovery with improving appetite and energy." (AR343). Plaintiff had "established care with an infectious disease doctor" and had started antiviral therapy. *Id.* Dr. Mackler again noted that Plaintiff presented with "no evidence to suggest relapse" of Burkitt's lymphoma. *Id.*

Plaintiff saw Dr. Neelay Kothari, M.D. on July 16, 2015. At this point, Plaintiff was taking Triumeq for his HIV, which he tolerated well. (AR420). Plaintiff suffered no adverse side effects from the Triumeq. *Id.* Plaintiff felt "well overall" and told Dr. Kothari that his energy level had improved. *Id.*

On July 29, 2015, Plaintiff returned to Dr. Mackler, who said that Plaintiff had "[n]o new complaints" and was "[f]eeling well." (AR504). On that same date, Liz Kirshner, NP, and Dr. Mark Weiner, M.D. evaluated Plaintiff for his leg, knee, and back pain, substance abuse, and suspected mood disorder. Plaintiff reported that his leg pain was "4-5/10." (AR527).

Plaintiff treated with Nurse Kirshner and Dr. Weiner several times throughout the summer of 2015. Their notes indicate that Plaintiff's level of pain continued to decrease.

On August 5, 2015, for example, Plaintiff reported "suboptimal pain management at 4-5/10." (AR526). On September 9, 2015, Plaintiff rated his pain level at a 4/10 and at a 2-3/10. (AR523). Finally, on September 17, 2015, Plaintiff reported no side effects from the pain medication and stated that his pain "has gone from a 5/10 down to 2/10." (AR522). He was also sleeping better. *Id.*

Plaintiff followed up with Dr. Kothari on September 3, 2015. Plaintiff continued feeling better overall, including "improvement in energy levels and overall strength." (AR410). Plaintiff had no "recent fever or chills," nor did he suffer from "cough or respiratory symptoms." *Id.* Plaintiff continued to tolerate the Triumeq and did not notice any "significant side effects."

Plaintiff returned to Dr. Mackler on September 30, 2015. Dr. Mackler said that Plaintiff was "[f]eeling well" and had "[n]o new complaints." (AR499).

Plaintiff met with Nurse Kirshner and Dr. Weiner again on December 9, 2015. Plaintiff "report[ed] his pain is manageable and at worst he does have some aches in the afternoon if he is active." (AR521). Plaintiff was "active at the gym three times a week, cycling and stretching." *Id.* He also did "all the grocery shopping and meal preparation for his husband." *Id.* Plaintiff and his husband did community service work at their church and signed up for cooking classes. *Id.* Plaintiff was also "sleeping well and feeling good." *Id.*

On January 13, 2016, Dr. Mackler said that Plaintiff "continues to feel well." Plaintiff's "energy level is stable and he has started working out at a gym 3x per week."

(AR649). Plaintiff "also report[ed] increase muscle strength" and denied "fever, night sweats, weight loss, swollen lymph nodes." *Id.*

Plaintiff treated with Dr. Kimberly McCord, M.D. on January 20, 2016 for a mild cough. The cough occurred occasionally and there were neither "aggravating factors" nor "relieving factors." (AR640). Dr. McCord took note of "[p]ertinent negatives" including "chills, fatigue, fever, night sweats, sinus pressure, sore throat and weight loss." *Id.*

The following day, Plaintiff treated with Dr. Kothari, who noted:

> For his HIV infection, he has been on Triumeq 1 tablet daily, which he continues to tolerate well. Since his last clinic visit in September 2015, he continues to feel relatively well overall. No missed Triumeq doses, no side effects or adverse drug effects that he is aware of.

(AR573).

Dr. Kothari also stated that Plaintiff planned "on taking a Caribbean cruise in March 2016." *Id.*

A February 8, 2016 note from Nurse Kirshner and Dr. Weiner stated that Plaintiff was using "buprenorphine in the context of chronic pain management." (AR678). Plaintiff reported "doing quite well on small amounts of buprenorphine" and that he did not suffer "side effects to this medication." *Id.* Plaintiff said that he was "doing quite well" and that "since his pain is well managed he is able to go to the gym three times a week." *Id.* Plaintiff "swim[s] on occasion as well" and "has become more active at the church." *Id.*

Based on these medical records, Defendant concluded that Plaintiff was no longer disabled as of February 14, 2016. It then terminated Plaintiff's disability benefits. (AR 186-188).

**B. Post-Termination**

On February 25, 2016, Plaintiff described his muscle pain to Dr. McCord as "mild-moderate." (AR630). He denied aggravating factors and said that the symptoms were "relieved by pain meds/drugs." *Id.*

Approximately one month later, after returning from the cruise, Plaintiff presented to Dr. McCord with vertigo. Dr. McCord noted that Plaintiff developed nausea on the cruise and that "[t]he problem was worsening." (AR626). Dr. McCord believed that Plaintiff was dehydrated and that "becoming more hydrated will take care of some of hi[s] symptoms." *Id.* Plaintiff saw Dr. McCord again on April 6, 2016. At that time, he complained of "chest pain, fever, headache, hearing loss, nausea, palpitations, seizures and vomiting." (AR617).

In April and May of 2016, Plaintiff was evaluated for his leg pain and a possible lymphoma relapse. (AR698, 701). Doctors performed an MRI of Plaintiff's lumbar spine and brain. Some abnormalities were observed at L1-L2 and L2-L3 of the lumbar spine. (AR703). The MRI of Plaintiff's brain showed normal results. (AR701).

Plaintiff appealed Defendant's termination decision on August 9, 2016. (AR539). In support of his appeal, Plaintiff submitted a self-prepared chronology and statement of his ailments and treatment, as well as medical records and statements from Doctors Kothari, McCord, Weiner, Mackler, and Nurse Kirshner.

Dr. Deborah Heaney, who is board certified in Occupational Medicine, performed an independent medical examination of Plaintiff in September 2016. Plaintiff told Dr. Heaney that Suboxone helped with his pain management. (AR1059). Dr. Heaney noted that Plaintiff complained of back pain and "constant nerve pain" in his left leg. *Id.* Plaintiff also had "numbness from peripheral neuropathy symptoms in both feet and hands." (AR1060). Plaintiff "can stand or walk 10-15 minutes at a time" and "uses a cane for stability when his back locks up." *Id.* (internal quotations omitted). Plaintiff said that "no etiology has been found for the dizziness and nausea which have been present since his cancer treatment." *Id.* Plaintiff did not mention the cruise to Dr. Heaney; in fact, he said "that the only vacation and travel he has been able to do is to drive a couple of times to Dayton, Ohio to see his children." *Id.*

Dr. Heaney reported that Plaintiff had "back arthritis and left leg pain." (AR1064). "His MRI substantiate[d] his back condition." *Id.* She stated that Plaintiff's "left leg nerve pain . . . [was] unexplained" and that Plaintiff had a "negative Romberg test."[2] *Id.* Dr. Heaney found "no medical data to explain [Plaintiff's] complaints of dizziness and nausea." *Id.* In addition, "the medical records do not support the severity" of the pain Plaintiff described." *Id.* Dr. Heaney highlighted the fact that there were "numerous inconsistencies" within the medical records, and that Plaintiff's "level of activity outlined in the records, including going on a cruise, is in stark contrast to" Plaintiff's history. *Id.* Finally, Dr. Heaney stated that

---

[2] "Negative Romberg test refers to a stable, well-balancing patient with her eyes either open or closed . . . Romberg test helps to assess posterior column dysfunction." https://library.med.utah.edu/kw/ms/answers_case01/answer1_9.html

> Past clinic notes suggest his pain was well controlled and that he was active and looking forward to a long vacation as well and additional activities. It mentions that he does all of the grocery shopping and meal preparation. There was no mention of needing a cane or back brace. There was no mention of significant peripheral neuropathy symptoms.

(AR1065).

Dr. Heaney opined that Plaintiff could not crawl or climb ladders. (AR1066). He could occasionally stand, walk, bend at the waist, squat at the knees, climb stairs, use foot controls, and drive. *Id.* He could continuously sit and do light lifting. *Id.* Dr. Heaney believed that Plaintiff was capable of working fulltime as of February 14, 2016. (AR1065).

Matthew Bolks, a Vocational Rehabilitation Specialist with Reliance, performed a Regular Occupation Review on December 7, 2016. Bolks noted that a Programmer-Analyst "is a sedentary exertion occupation" and that the physical demands of the job included the "ability to lift, carry, push/pull 10 pounds occasionally" and "reaching, handling, fingering, talking, hearing, near acuity, and accommodation frequently." (AR1139). Plaintiff's physical restrictions, said Bolks, were "consistent with the physical demands of a Programmer-Analyst," and therefore, Plaintiff "would not be precluded from performing his Regular Occupation." (AR1140).

Defendant affirmed the decision to discontinue benefits on December 16, 2016.

### LEGAL STANDARD

Because the benefit plan at issue here confers discretionary authority upon the administrator, the Court reviews the administrator's determination of benefits using the "arbitrary and capricious" standard. *University Hosps. of Cleveland v. Emerson Elec. Co.*,

202 F.3d 839, 845 (6th Cir. 2000). This is "the least demanding form of judicial review." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003). The Court will uphold the benefits determination "if, in light of the plan's provisions, it is rational." *Marquette Gen. Hosp. v. Goodman Forest Indus.*, 315 F.3d 629, 632 (6th Cir. 2003). The Court must account for the fact that Reliance is operating under a potential conflict of interest "because it is both the decision-maker, determining which claims are covered, and also the payor of those claims." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005) (citing *Marks v. Newcourt Credit Group*, 342 F.3d 444, 457 (6th Cir. 2003)). Although Reliance's conflict of interest does not alter the Court's arbitrary and capricious standard of review, its dual role is a factor that must be considered in applying that standard. *Id.*; *see also Whitaker v. Hartford Life and Accident Insurance Co.*, 121 Fed. Appx. 86, 87 (6th Cir. 2005).

## ANALYSIS

The parties agree that Plaintiff was entitled to disability benefits prior to February 14, 2016. What is disputed is whether Plaintiff was Totally Disabled after February 14, 2016.

Plaintiff argues that the record evidence overwhelmingly shows that he remains disabled and is entitled to LTD benefits. Plaintiff also submits that the findings of Dr. Heaney, the independent medical examiner, actually support his claims. He also, however, takes issue with the fact that Dr. Heaney practices occupational medicine rather than hematology and/or oncology. Finally, Plaintiff highlights the fact that Defendant

forced him to apply for SSD benefits and then denied his claim when Defendant stood to benefit financially.

## I. The opinions of Plaintiff's treating physicians

With respect to the weight given to the opinions of different doctors, the Supreme Court has stated:

> Courts have no warrant to require administrators automatically to accord special weight to the opinions of the plaintiff's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 834 (2003).

Although Defendant "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician," *Id.*, it also "need not defer to the opinions of treating physicians." *Fant v. Hartford Life and Acc. Ins. Co.*, No. 09-12468, 2010 WL 3324974, at *8 (E.D. Mich. Aug. 20, 2010) (internal citation omitted).

Contrary to Plaintiff's arguments, the record shows that Defendant conducted a meaningful review of Plaintiff's medical history and that its denial of benefits was "the result of a deliberate, principled reasoning process." *DeLisle v. Sun Life Assur. Co. of Canada*, 558 F.3d 440, 444 (6th Cir. 2009). In fact, Defendant *did* credit Plaintiff's treating doctors, as the vast majority of their medical records showed that throughout 2015 and into 2016, Plaintiff's condition was improving. Dr. Mackler, who is board certified in Hematology and Oncology, saw Plaintiff multiple times in June, July, and September of 2015. He found that Plaintiff was "steadily improving his strength"; Plaintiff was "making a steady recovery with improving appetite and energy"; and that

Plaintiff was "[f]eeling well" and had "[n]o new complaints." (AR343, 349, 499). As recently as January 2016, a month before the termination of benefits, Plaintiff told Dr. Mackler that his energy had improved such that he "started working out at a gym 3x per week." (AR649). Dr. Kothari, who is board certified in Internal Medicine and Infectious Disease, also treated Plaintiff multiple times in 2015 and in January 2016. Like Dr. Mackler, Dr. Kothari observed steady improvement in Plaintiff's condition; Plaintiff's "energy levels and overall strength" increased and he "continued to feel relatively well overall." (AR410, 573). Even immediately after the termination of benefits, when Plaintiff treated with Dr. McCord for musculoskeletal pain, Dr. McCord characterized the "[s]everity level" of Plaintiff's pain as "mild-moderate." (AR630).

Defendant properly rejected the July and August 2016 statements of Doctors Kothari, McCord, and Mackler, on which Plaintiff heavily relies in support of his appeal. These statements are identical. (AR562, 616, 648). Each statement contains the following paragraph:

> It is my medical opinion that Mr. Wilson is not able to work due to frequent exhaustion, lack of sleep, inability to sit for extended periods and frequent nausea in the morning. He does not have near the stamina needed to reliably work on a routine basis. Mr. Wilson's problems are frequent and unpredictable. He is not able to sit and concentrate on computer work or talk on the phone with customers or to participate in meetings at work.

*Id.*

Other portions of the doctors' statements mirror parts of Plaintiff's statement, as shown in the comparison below:

| Plaintiff's Statement | Statements of Doctors Kothari, McCord, and Mackler |
|---|---|
| I have **constant back pain, leg pain, foot pain/numbness**. I take **medication for nerve neuropathy pain and back pain 3 times a day, and a muscle relaxer at bedtime for the nerve pain**. I have difficulty getting comfortable and falling **sleeping due to the back and leg/foot pain** . . . I **wake up feeling exhausted and light-headed/dizzy** . . . I am **often dizzy and nauseated in the morning for several hours**. I **take medication as needed for nausea** . . . I need to **get up and stretch every 30-60 minutes because my feet and legs ache and my feet go numb**. **The leg nerve pain has gotten worse in the past year, spreading to both legs**. **Sometimes the dizziness and nausea lasts for several days** and I get dehydrated. (AR559). | Mr. Wilson has **constant back pain, leg pain, foot pain/numbness**, and hand numbness. He is prescribed **medication for neuropathy pain and back pain which he takes 3 times a day and a muscle relaxer at bedtime for the nerve pain**. He reports difficulty **sleeping due to the back and leg/foot pain**. He reports waking up **feeling exhausted and light-headed/dizzy**. He is frequently exhausted during the day. He is **often dizzy and nauseated in the morning for several hours**. He **takes medication as needed for nausea** . . . Mr. Wilson needs to **get up and stretch every 30-60 minutes because his feet and legs ache and his feet go numb** . . . He reports **the leg nerve pain has gotten worse in the past year, spreading to both legs. Sometimes the dizziness and nausea lasts for several days**. (AR 562, 616, 648). |

These physicians' statements indicate an abrupt shift in position from their earlier treatment notes and records. It appears that rather than providing objective findings and evidence of Plaintiff's pain, the doctors simply rubber stamped Plaintiff's claims. *See Keskeny v. United of Omaha Life Ins. Co.*, No. 16-11362, 2017 U.S. Dist. LEXIS, at *27 (E.D. Mich. Feb. 24, 2017) (raising doubt as to the opinions of treating physicians due to inconsistencies and conclusory statements contained therein). Defendant "was not obligated to blindly accept the treating physicians' opinions," especially in light of the

fact that their statements conflicted with their medical records. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 167 (6th Cir. 2007).

## II. Dr. Heaney's Analysis

Plaintiff's argument as to Dr. Heaney's findings seems to cut in opposite directions: he claims that her conclusions actually support his disability, but also contends that the Court should discount her opinions because she lacked the relevant medical expertise. In support of his position, he cites to *Okuno v. Reliance Standard Life Insurance Company*, 836 F.3d 600 (6th Cir. 2016), in which the court articulated several reasons as to why Reliance erred. First, Reliance's physician did not physically examine the plaintiff, and Reliance's denial of benefits was based exclusively on file reviews by its doctors. In light of the fact that Reliance had the right to conduct a physical examination, the failure to do so "raise[d] questions about the thoroughness and accuracy of the benefits determination." *Id.* at 610 (quoting *Shaw v. AT&T Umbrella Ben. Plan No. 1*, 795 F.3d 538, 550 (6th Cir. 2015)). In addition, despite the fact that Reliance denied the plaintiff's LTD benefits because "her disability included a psychiatric component," it failed to consult with a mental health expert. *Id.* at 611. Reliance's determination was also arbitrary and capricious because its doctors never consulted with plaintiff's treating physicians and because it provided inconsistent, shifting explanation "in support of its denial . . . over the course of the appeals process." *Id.* at 612.

The fact that Defendant here hired an independent medical examiner to do a physical examination of Plaintiff – in addition to reviewing his medical records – distinguishes this case from *Okuno*, and weighs against an arbitrary and capricious

finding. Another factor that favors Defendant's position is that the basis underlying the denial "was consistent throughout the administrative review process." *Id.* (quoting *Judge v. Metropolitan Life Ins. Co.*, 710 F.3d 651, 659 (6th Cir. 2013)).

Plaintiff takes issue with the fact that Dr. Heaney – the independent medical examiner – practices occupational medicine rather than hematology and/or oncology. The facts here are a mixed bag. The medical records from late 2015 and early 2016, immediately prior to Defendant's decision to terminate benefits, show that Plaintiff's cancer was in remission and that his condition was improving. *See, e.g.*, AR640, 649, 678. However, during Plaintiff's April 24, 2016 hospital visit, there was some cause for concern: Dr. McCord opined that the "abnormal enhancement involving [Plaintiff's] dorsal paraspinal soft tissues" as well as the "abnormal smooth enhancement of the cauda equina nerve roots," could be related to Plaintiff's lymphoma. (AR703). It appears that Dr. Heaney examined these medical records, but it is unclear how she considered this information. The records from Plaintiff's May 6, 2016 examination, when he was again evaluated for relapse, showed that Plaintiff tested negative for malignant cells. (AR700).

The fact that Plaintiff was examined by an occupational physician rather than a hematologist and/or oncologist is not dispositive in this case. Plaintiff points to no evidence in the record showing that as of the time he was examined by Dr. Heaney, in September 2016, his cancer had returned, thereby creating the need for an examination by a cancer specialist.

### III. SSD Benefits

Defendant offered to assist Plaintiff with his application for Social Security Disability benefits. Plaintiff seems to argue that this compels the conclusion that Defendant's denial of benefits was arbitrary and capricious.

"A determination that a person meets the Social Security Administration's ["SSA"] uniform standards for disability benefits does not make her automatically entitled to benefits under an ERISA plan, since the plan's disability criteria may differ from the Social Security Administration's." *DeLisle*, 558 F.3d at 445-46 (citing *Whitaker v. Hartford*, 404 F.3d 947, 949 (6th Cir. 2005)). That said, the SSA determination "is far from meaningless." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294 (6th Cir. 2005). "If the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious." *Bennett v. Kempher Nat. Services, Inc.*, 514 F.3d 547, 554 (6th Cir. 2008).

It is undisputed that Defendant offered to assist Plaintiff with applying for Social Security benefits and that it benefitted financially from Plaintiff's receipt of those benefits. The problem for Plaintiff, however, is that he received SSD and LTD benefits concurrently for approximately six months, from September 2015 through February 2016. As far as the Court can tell, Plaintiff has not submitted any evidence showing that the SSA either monitored his medical records or his progress after September 2015.

Additionally, Plaintiff points to "nothing more than the general observation that [Defendant] had a financial incentive to deny the claim." *Judge*, 710 F.3d at 664.

"'[A] conflict of interest, standing alone, does not require reversal,' meaning a claimant 'must do more than offer general inferences of a conflict based on self-interest.'" *Collins v. Unum Life Insurance Company of America*, 682 Fed. Appx. 381, 387 (6th Cir. 2017) (quoting *Cultrona v. Nationwide Life Ins. Co.*, 748 F.3d 698, 704 (6th Cir. 2014)). Plaintiff has not done so here.

## CONCLUSION

There is no question that Plaintiff suffers from a number of health issues. However, "the presence of a medically-determinable condition does not necessarily translate into a finding of disability." *Bencivenga v. Unum Life Ins. Co.*, No. 14-10118, 2015 WL 1439697, at *8 (E.D. Mich. Mar. 27, 2015) (quoting *Cooper*, 486 F.3d at 166). Because Defendant has provided "a reasonable explanation for [its] decision denying benefits in light of the plan's provisions . . . [ ] the decision is neither arbitrary nor capricious" *Schwalm v. Guardian Life Ins. Co. of America*, 626 F.3d 299, 308 (6th Cir. 2010).

Accordingly, for the reasons discussed above,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [10] is **GRANTED**. Plaintiff's Motion for Summary Judgment [11] is **DENIED**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: February 21, 2018     Senior United States District Judge